**Opinion filed March 29, 2019**



In The

# Eleventh Court of Appeals

_____

## No. 11-17-00067-CR
_____

## DARIL OSIAS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 244th District Court**
**Ector County, Texas**
**Trial Court Cause No. C-16-0966-CR**

## MEMORANDUM OPINION

The jury convicted Daril Osias of the third-degree felony offense of injury to a child by omission. Appellant elected to have the trial court assess punishment. The trial court assessed Appellant's punishment at confinement for six years, suspended the imposition of Appellant's sentence, and placed him on community supervision for six years. Appellant brings four issues on appeal. Appellant contends that (1) the trial court erred when it denied Appellant's motion for a

directed verdict, (2) the evidence is legally insufficient to support Appellant's conviction, (3) the trial court abused its discretion when it denied Appellant's motion for a new trial, and (4) Appellant's trial counsel was ineffective when he failed to object to the State's improper comments during closing arguments. We affirm.

Appellant and Jessie Brumley are the parents of S.O., the child victim in this case. Brumley posted a request for baby formula on a Facebook group for mothers. Lauren McMullen, a member of the group, saw the post and offered to take formula to Brumley. McMullen testified that, when she arrived at Brumley's trailer, she noticed that S.O. was not moving and that his feet were "so tiny"; S.O. was approximately two and one-half months of age at the time. McMullen "felt like something was wrong." She looked through pictures of S.O. on Brumley's Facebook page and noticed that the "skin on his legs w[as] hanging" and that he appeared "malnourished." McMullen contacted Child Protective Services and reported that she thought that S.O. was not being fed.

Because of the severity of the conditions that McMullen outlined in her report, Leslie Nolasco, an investigator with the Texas Department of Family and Protective Services, made an unannounced visit to the trailer where Appellant lived. After Nolasco entered the trailer, she noticed that S.O. "hadn't [been] bathed in days," that his "skin was hanging . . . nearly off his bones," and that, although he was not crawling yet, he had scratches on his knees. When Brumley attempted to feed S.O., Brumley took the bottle out of S.O's mouth before he could nurse properly, even though he was trying.

Nolasco asked Appellant and Brumley to take S.O. to the hospital. Appellant insisted that S.O. was fine, but he complied with her request. Appellant did not appear to be concerned that S.O.'s health was at risk.

After Appellant and Brumley took S.O. to the emergency room, Appellant left to get food from McDonald's for himself and Brumley. While at the hospital,

Brumley was admitted into the emergency room due to stomach pains and vomiting. When Appellant returned, Appellant stayed with Brumley rather than S.O. Nolasco took care of S.O. and S.M., S.O.'s older sibling; CPS conducted an emergency removal of both children.

Deputy John Rainey of the Ector County Sheriff's Office testified that, when he arrived at the hospital to assist Nolasco, he noticed that S.O. was "emaciated," had a "real foul odor," had "a redness and a rash on his genitals," and had a "pressure sore right around the tailbone." Appellant told Deputy Rainey that, on Appellant's days off, he fed S.O. three times a day. Brumley told Deputy Rainey that she had stopped breastfeeding and that, even though she gave S.O. formula, he would "throw it up."

Dr. Vic Wall treated S.O. in the emergency room. Dr. Wall testified that S.O. was "extremely emaciated and extremely dry" and that S.O. had "already used all of [his] fat stores and was breaking down muscle tissue." Dr. Wall diagnosed S.O. with food deprivation and testified that it would take weeks of starvation to cause S.O.'s condition.

Lisa Morgan, the speech therapist who later treated S.O. for his feeding difficulties, testified that, when S.O. tried to drink from his bottle, milk spilled from his mouth and that he also coughed and choked when he ate. After Morgan made some adjustments to his bottle feeding, S.O. improved.

Dr. Babatunde Jinadu, the pediatrician who supervised S.O.'s subsequent recovery, suspected child neglect because S.O. was undernourished and underweight. Dr. Jinadu testified that the lack of opportunity to eat caused S.O. to be malnourished.

Deborah Puckett, an investigator with the Ector County Sheriff's Office, interviewed Appellant. Appellant told Investigator Puckett that the doctors did not tell him that anything was wrong with S.O. Appellant claimed that S.O.'s condition

was normal for someone born in the Philippines. He also told Investigator Puckett that he believed that S.O. had a genetic condition because Appellant and Appellant's father were skinny as well.

Dr. Jose Benigno, S.O.'s initial pediatrician, testified that there was no basis for the belief that Philippine babies usually do not gain much weight. Dr. Benigno first saw S.O. on August 31, 2015, when S.O. was seven weeks old. Dr. Benigno testified that a neonatal screen should have been done when S.O. was two weeks old; that did not happen. S.O. weighed six pounds one ounce when Dr. Benigno saw him. Brumley told Dr. Benigno that S.O. weighed five pounds twelve ounces at birth. In fact, according to medical records, S.O. weighed six pounds twelve ounces at birth; Appellant did not correct Brumley's false information. Therefore, the medical records and Dr. Benigno's testimony showed a seven-week weight loss of some eleven ounces rather than a weight gain. Babies usually gain about four to seven ounces per week. Dr. Benigno was concerned because S.O. was "irritable," "acting hungry," and was "rooting."

Neither Appellant nor Brumley expressed any concerns to Dr. Benigno about any feeding issues. Appellant and Brumley told Dr. Benigno that Brumley breastfed S.O. every three hours. Dr. Benigno told Brumley to breastfeed S.O. "at least one and a half hours to every two hours." Dr. Benigno asked Brumley and Appellant to bring S.O. back in one week for a weight check. Neither Appellant nor Brumley ever brought S.O. back to Dr. Benigno. Dr. Benigno testified that, if he had known S.O.'s correct birth weight, he would have admitted S.O. to the hospital.

Appellant and Brumley did see Dr. Benigno on September 29, 2015, but they did not bring S.O. The purpose of their return to Dr. Benigno was to ask him to write a letter to the effect that babies "in our race" usually do not gain much weight; he declined their request because Asian babies gain the same as others.

4

At the conclusion of the State's evidence, Appellant orally moved for a directed verdict. He argued that the State did not prove that Appellant intentionally, knowingly, or recklessly violated the law. Appellant further claimed that the State had failed to establish all the required elements of the charged offense. The trial court summarily denied Appellant's motion for directed verdict.

The jury convicted Appellant of injury to a child by omission. After a punishment hearing, the trial court, as we have said, assessed Appellant's punishment at confinement for six years. The trial court suspended the imposition of the sentence and placed Appellant on community supervision for six years.

Appellant timely filed a motion for new trial and motion in arrest of judgment in which he asserted that the verdict was contrary to the law and the evidence and that the State had failed to prove the elements set forth either in the indictment or in the charge to the jury. The trial court denied Appellant's motion without a hearing. This appeal followed.

In his first issue on appeal, Appellant claims that the trial court erred when it denied his motion for directed verdict because the State had failed to prove the "requisite *mens rea* for either a third degree felony or state jail felony charge of injury to a child by omission." A challenge to a trial court's denial of a motion for directed verdict is reviewed under the same standard used to review a legal sufficiency challenge. *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).

In his second issue on appeal, Appellant contends that the evidence is legally insufficient to support his conviction. He bases his issue on a claim that the State failed to prove beyond a reasonable doubt that Appellant committed the offense intentionally or knowingly.

In his third issue on appeal, Appellant contends that the trial court abused its discretion when it denied Appellant's motion for new trial. As he does in his first

5

and second issues, Appellant bases his third issue on an assertion that the evidence was insufficient to support a conviction.

Each of Appellant's first three issues involves claims related to the sufficiency of the evidence. We will review all three issues together.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). When we conduct a sufficiency review, we consider all the evidence admitted at trial, as well as improperly admitted pieces of evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

We review a trial court's denial of a motion for new trial under an abuse of discretion standard. *Keeter v. State*, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002) (citing *Jones v. State*, 711 S.W.2d 35, 36 (Tex. Crim. App. 1986); *Etter v. State*, 679 S.W.2d 511, 515 (Tex. Crim. App. 1984)). We view the evidence in the light most favorable to the trial court's ruling and will not overturn a trial court's decision to deny a

motion for new trial unless the decision falls outside the zone of reasonable disagreement. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007) (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)).

A person commits the third-degree felony offense of injury to a child by omission if he intentionally or knowingly causes bodily injury to a child. TEX. PENAL CODE ANN. § 22.04(a)(3), (f) (West Supp. 2018). An omission that causes injury to a child constitutes an offense if the person has care, custody, and control of the child or a legal or statutory duty to act. *Id.* § 22.04(b). Intent or knowledge may be inferred from the acts, words, and conduct of an accused at the time of the offense. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (citing *Beltran v. State*, 593 S.W.2d 688, 689 (Tex. Crim. App. 1980)). Intent may also be inferred from the extent of the victim's injuries, the method used to produce the injuries, and the relative size and strength of the parties. *Id.* (citing *Lindsey v. State*, 501 S.W.2d 647, 648 (Tex. Crim. App. 1973).

The evidence showed that Appellant was S.O.'s father. Therefore, he had a legal duty to feed S.O. *See* PENAL § 22.04(b).

Dr. Benigno was concerned about S.O. because S.O. "was acting hungry" and was "irritable." Although Dr. Benigno told Appellant and Brumley that they should feed S.O. more frequently and that they should bring S.O. back in one week, they never took S.O. back. Had Dr. Benigno known S.O.'s true birth weight, he would have hospitalized S.O.; Appellant said nothing when Brumley misinformed Dr. Benigno of S.O.'s actual birth weight.

Ultimately, during an unannounced visit to Appellant's trailer, CPS Investigator Nolasco noticed, among other things, that S.O.'s "skin was hanging . . . nearly off his bones." She instructed Appellant and Brumley to take S.O. to the emergency room. Appellant claimed that there was nothing wrong with S.O. but agreed to take him to the emergency room.

Dr. Wall described S.O. as "extremely emaciated and extremely dry" and said that S.O. had "already used all of [his] fat stores" and "was breaking down muscle tissue." Dr. Wall testified that S.O.'s physical appearance was enough notice that S.O. needed medical care and that it would take weeks of starvation to cause S.O.'s condition. An emergency room nurse, Keary Brem, testified that S.O. was visibly "very sick." Dr. Jinadu testified that the lack of opportunity to eat caused S.O. to be malnourished.

As to Appellant's claim that there was nothing wrong with S.O. but that S.O. was small because Philippine babies do not gain much weight right after birth, Dr. Benigno testified that there was no basis for such a statement. Appellant's activities at the hospital while medical personnel administered emergency treatment to S.O. further supports Appellant's lack of concern for S.O. and supports his conviction.

When we consider the evidence admitted at trial in the light most favorable to the verdict, we conclude that a rational jury could have found that Appellant intentionally or knowingly injured S.O. by omission. We also conclude that the trial court did not err when it denied Appellant's motion for directed verdict and did not abuse its discretion when it denied Appellant's motion for new trial. We overrule Appellant's first, second, and third issues on appeal.

In his fourth issue on appeal, Appellant contends that trial counsel was ineffective when counsel failed to object to the State's allegedly improper comments during closing arguments to the jury. Appellant asserts that the prosecutor improperly commented on Appellant's election not to testify when the prosecutor stated: "Does he ever, at any point in this trial, admit that there is anything wrong with his child? Not at all. Does he ever show the slightest concern? No." For the reasons stated below, even if we were to agree that the State's argument was

8

improper, Appellant has not shown that trial counsel rendered ineffective assistance when counsel did not object to the State's argument.

To establish that trial counsel rendered ineffective assistance at trial, Appellant must show that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that the result would have been different but for counsel's errors. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. at 694. There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, and the defendant must overcome the presumption that the challenged action could be considered sound trial strategy. *Strickland*, 466 U.S. at 689.

A claim of ineffective assistance of counsel must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson*, 9 S.W.3d at 814 (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). Direct appeal is usually an inadequate vehicle to raise such a claim because the record is generally undeveloped. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Trial counsel should ordinarily have an opportunity to explain his actions before an appellate court denounces counsel's actions as ineffective. *Id.* Without this opportunity, an appellate court should not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

Appellant has failed to overcome the presumption that counsel's decision not to object to the argument fell within the range of reasonable professional assistance. Appellant bears the burden to overcome that presumption. *Thompson*, 9 S.W.3d at 813. Here, the record is silent as to why Appellant's trial counsel did not object to

the argument. Appellant filed a motion for new trial and a motion in arrest of judgment, but there was no hearing on the motion. Because the record is silent, it must be apparent "that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). Here, it is reasonable that trial counsel might have decided not to object to the argument because it would draw more attention to the State's comment. The decision not to object to the argument would not have been "so outrageous that no competent attorney would have engaged in it." *Garcia*, 57 S.W.3d at 440; *see Orellana v. State*, 489 S.W.3d 537, 550 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (citing *Kuhn v. State*, 393 S.W.3d 519, 539 (Tex. App.—Austin 2013, pet. ref'd)). We overrule Appellant's fourth issue on appeal.

We affirm the judgment of the trial court.


JIM R. WRIGHT
SENIOR CHIEF JUSTICE


March 29, 2019

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[1]

Willson, J., not participating.

---

[1]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.